IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF NEW YORK

————————————————————————

TRACI M. R., on behalf of B.O., a minor,

                    Plaintiff,

         v.                                    Civil Action No.
                                               5:21-CV-0612 (BKS/DEP)

COMMISSIONER OF SOCIAL SECURITY,

                    Defendant.

————————————————————————

APPEARANCES:                          OF COUNSEL:

FOR PLAINTIFF

OLINSKY LAW GROUP                     HOWARD D. OLINSKY, ESQ.
250 South Clinton St., Suite 210      CAEDEN SEHESTED, ESQ.
Syracuse, New York 13202

FOR DEFENDANT

SOCIAL SECURITY ADMIN.                HUGH D. RAPPAPORT, ESQ.
625 JFK Building
15 New Sudbury St
Boston, MA 02203


DAVID E. PEEBLES
U.S. MAGISTRATE JUDGE


REPORT AND RECOMMENDATION

Plaintiff has commenced this proceeding, pursuant to 42 U.S.C. §§

405(g) and 1383(c)(3), to challenge a determination of the Commissioner of

Social Security ("Commissioner") finding that her minor son, B.O. ("claimant"), was not disabled at the relevant times and, accordingly is ineligible for the supplemental security income ("SSI") benefits for which she applied on his behalf.  The matter has been referred to me for the issuance of a report and recommendation, pursuant to 28 U.S.C. § 636(b) and Northern District of New York Local Rule 72.3.  For the reasons set forth below, I recommend a finding that the Commissioner's determination resulted from the application of proper legal principles and is supported by substantial evidence.

I.    BACKGROUND

Claimant was born in December of 2003, and is currently eighteen years of age.  He was fourteen years old at the date of his mother's application for benefits on June 15, 2018.  Claimant was measured at five feet and ten inches at the time of the application, and has weighed between one hundred and sixty-five and two hundred and five pounds during the relevant period.  Claimant resides in the downstairs apartment of a two-family house in Cortland, New York, with his mother and his younger sister, who is autistic.

Claimant has been at various times during the relevant period in middle and high school, and at the time of the ALJ's decision was between

ninth and tenth grade.  He is subject to an individualized education plan ("IEP") and participates in special education classes as a result of his impairments.

Plaintiff and claimant allege that claimant suffers from various mental and intellectual impairments that impact his ability to regulate his emotions, perform tasks both at school and at home, and maintain attention and concentration.  In addition to these impairments, claimant also has also been diagnosed as suffering from asthma, is obese, and claims to suffer from liver pain, diarrhea, and vomiting.  During the relevant period, claimant has been treated for his conditions and symptoms by primary care physician Dr. Fadi Alass and other sources at Family Health Network of Central New York, the emergency department of Cortland Regional Medical Center, and licensed master social worker ("LMSW") Cindy Horn.

Plaintiff reported during the administrative hearing held to address her claim for benefits on claimant's behalf that it is difficult to convince the claimant to do his schoolwork and complete chores around the house, and to wake him up in the morning for school.  She testified that he has anxiety that causes him to chew on his shirts, urinate in cups in his room at night, and destroy objects, although he does not hurt people.  She further stated that the claimant refuses to go to counseling but will participate in

telephone appointments with his pediatrician, and he was recently provided medication for his anger and to help him sleep. She also reported that the claimant has chronic diarrhea, the cause of which is currently being investigated.

Claimant also testified at hearing, reporting that he wants to do his schoolwork, but he often does not understand it and has to ask a teacher for assistance. The amount of work he is supposed to be doing and his inability to understand it causes him to feel anxious. He has had many absences from school mostly because he does not want to go, although he has also recently been sick more frequently. Claimant also reports that he has difficulty paying attention at school. He prefers to stay by himself because other people make him frustrated, which causes him to get angry and break things when he is at home. In school, claimant is good at English and History, but does not do well at Biology and Math, and his teachers often make him angry, although he does not lash out at school. At home, claimant enjoys playing video games on his computer and watching YouTube videos. He does not exercise, although he expressed that he would be interested in playing football if his school fielded a team in that sport. Claimant additionally reports that he does not do the chores his mother asks him to do, and that he is afraid of the dark.

II.    PROCEDURAL HISTORY

    A.    Proceedings Before the Agency

Plaintiff applied for Child SSI payments under Title XVI of the Social Security Act on June 15, 2018. In support of that application, she alleged a disability onset date of April 1, 2018, and asserted that claimant is disabled based on attention deficit hyperactivity disorder ("ADHD"), a learning disability, and depression.

A video hearing was conducted on May 8, 2020, by administrative law judge ("ALJ") Kenneth Theurer, to address plaintiff's application for benefits on behalf of claimant. Following that hearing, ALJ Theurer issued an unfavorable decision on June 5, 2020. That opinion became a final determination of the agency on March 24, 2021, when the Social Security Appeals Council ("Appeals Council") denied plaintiff's request for review of the ALJ's decision.

    B.    The ALJ's Decision

In his decision, ALJ Theurer applied the familiar three-step sequential evaluation procedure for assessing whether a child claimant meets the standard for disability under the regulations. At step one, he found that claimant had not engaged in substantial gainful activity during the relevant time period. At step two, ALJ Theurer found that claimant suffers from

severe impairments that impose more than minimal limitations on his

functional abilities, including ADHD, depression, anxiety, and a learning

disorder with a history of special education, sometimes described as a mild

intellectual disability.  The ALJ further found that claimant's asthma and

obesity are non-severe impairments, and notations of schizophrenia, rule

out autism, developmental delay, remote history of finger fracture, sprained

ankles and knees, history of persistent vomiting, and weight loss of one

hundred pounds all represent impairments that are not medically

determinable.

At step three, ALJ Theurer examined the governing regulations of the

Commissioner setting forth presumptively disabling conditions (the

"Listings"), *see* 20 C.F.R. Pt. 404, Subpt. P, App. 1, and concluded that

claimant's conditions do not meet or medically equal any of the listed,

presumptively disabling conditions set forth in the regulations, specifically

considering Listings 112.04, 112.06, and 112.11.  ALJ Theurer went on to

find that claimant's impairments also do not functionally equal any of the

childhood listings, determining that he has less than marked limitations in

the domains of acquiring and using information, attending and completing

tasks, interacting and relating with others and caring for himself, and no

limitations in the domains of moving about and manipulating objects and

health and physical wellbeing.

Based upon these findings, ALJ Theurer concluded that claimant is not disabled.

C.    This Action

Plaintiff commenced this action on May 27, 2020.[1]  In support of her challenge to the ALJ's determination, plaintiff argues that the ALJ's conclusion that claimant's impairments do not functionally equal a listing is based on mischaracterizations and erroneous evaluation of the evidence, including of the available opinion evidence.  Dkt. No. 19.

Oral argument was conducted in this matter, by telephone, on October 6, 2022, at which time decision was reserved.

III.   DISCUSSION

A.    Scope of Review

A court's review under 42 U.S.C. §§ 405(g) and 1383(c)(3) of a final decision by the Commissioner is subject to a "very deferential" standard of review, and is limited to analyzing whether the correct legal standards were applied, and whether the decision is supported by substantial evidence.

---

[1]     This action is timely, and the Commissioner does not argue otherwise.  It has been treated in accordance with the procedures set forth in General Order No. 18. Under that General Order, the court treats the action procedurally as if cross-motions for judgment on the pleadings have been filed pursuant to Rule 12(c) of the Federal Rules of Civil Procedure.

*Brault v. Soc. Sec. Admin., Comm'r*, 683 F.3d 443, 448 (2d Cir. 2012);

*Veino v. Barnhart*, 312 F.3d 578, 586 (2d Cir. 2002); *Shaw v. Chater*, 221

F.3d 126, 131 (2d Cir. 2000); *Schaal v. Apfel*, 134 F.3d 496, 501 (2d Cir.

1998).  Where there is reasonable doubt as to whether the ALJ applied the

proper legal standards, the decision should not be affirmed even though

the ultimate conclusion reached is arguably supported by substantial

evidence.  *Johnson v. Bowen*, 817 F.2d 983, 986 (2d Cir. 1987).  If,

however, the correct legal standards have been applied, and the ALJ's

findings are supported by substantial evidence, those findings are

conclusive, and the decision will withstand judicial scrutiny regardless of

whether the reviewing court might have reached a contrary result if acting

as the trier of fact.  *Veino*, 312 F.3d at 586; *Williams v. Bowen*, 859 F.2d

255, 258 (2d Cir. 1988); *see also* 42 U.S.C. § 405(g).

　　The term "substantial evidence" has been defined as "such relevant

evidence as a reasonable mind might accept as adequate to support a

conclusion."  *Richardson v. Perales*, 402 U.S. 390, 401 (1971) (quoting

*Consol. Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938)); *accord, Jasinski v.

Barnhart*, 341 F.3d 182, 184 (2d Cir. 2003).  To be substantial, there must

be "more than a mere scintilla" of evidence scattered throughout the

administrative record.  *Richardson*, 402 U.S. at 401 (internal quotation

8

marks omitted); *Williams*, 859 F.3d at 258.  "To determine on appeal

whether an ALJ's findings are supported by substantial evidence, a

reviewing court considers the whole record, examining evidence from both

sides, because an analysis on the substantiality of the evidence must also

include that which detracts from its weight."  *Williams*, 859 F.2d at 258

(citing *Universal Camera Corp. v. NLRB*, 340 U.S. 474, 488 (1951);

*Mongeur v. Hechler*, 722 F.2d 1033, 1038 (2d Cir. 1983)).

    B.    <u>Disability Determination: The Childhood Disability Evaluation</u>
           <u>Process</u>

An individual under the age of eighteen is disabled, and thus eligible

for SSI benefits, if he or she has not engaged in substantial gainful activity

and has a medically determinable physical or mental impairment which

results in marked and severe functional limitations, and which can be

expected to result in death, or which has lasted or can be expected to last

for a continuous period of not less than twelve months.  42 U.S.C. §

1382c(a)(3)(C)(i); *see Hudson v. Astrue*, 1:06-CV-1342, 2009 WL 1212114,

at *3-4 (N.D.N.Y. Apr. 30, 2009) (discussing the standard for children's

disability benefits).

The agency has developed a three-step protocol to be employed in

determining whether a child can meet the statutory definition of disability.

20 C.F.R. § 416.924; *Kittles v. Barnhart*, 245 F. Supp. 2d 479, 487-88

(E.D.N.Y. 2003); *Ramos v. Barnhart*, 02 Civ. 3127, 2003 WL 21032012, at *7 (S.D.N.Y. May 6, 2003). The first step of the test requires a determination of whether the child has engaged in substantial gainful activity. 20 C.F.R. § 416.924(b); *Kittles*, 245 F. Supp. 2d at 488. If so, then by statute and by regulation, the child is ineligible for SSI benefits. 42 U.S.C. § 1382c(a)(3)(C)(ii); 20 C.F.R. § 416.924(b).

If the child has not engaged in substantial gainful activity, the second step of the test requires examination of whether he or she suffers from one or more medically determinable impairments that, either alone or in combination, are properly regarded as "severe," in that they cause more than a minimal functional limitation. 20 C.F.R. § 416.924(c); *Kittles*, 245 F. Supp. 2d at 488; *Ramos*, 2003 WL 21032012, at *7. If the child is found to have a severe impairment, the Commissioner must then determine, at the third step, whether the impairment meets or equals a presumptively disabling condition identified in the listing of impairments set forth in 20 C.F.R. Pt. 404, Subpt. P., App. 1. *Id.* Equivalence to a listing can be either medical or functional. 20 C.F.R. § 416.924(d); *Kittles*, 245 F. Supp. 2d at 488; *Ramos*, 2003 WL 21032012, at *7. If an impairment is found to meet, or qualify as medically or functionally equivalent to, a listed impairment, and the twelve-month durational requirement is satisfied, the claimant will be

found to be disabled.  20 C.F.R. § 416.924(d)(1); *Ramos*, 2003 WL 21032012, at *8.

"Functional" equivalence must be examined only if it is determined that the claimant's impairment does not meet or medically equal the criteria for a listed impairment.  Analysis of functionality is informed by consideration of how a claimant functions in six main areas referred to as "domains."  20 C.F.R. § 416.926a(b)(1); *Ramos*, 2003 WL 21032012, at *8. The domains are described as "broad areas of functioning intended to capture all of what a child can or cannot do."  20 C.F.R. § 416.926a(b)(1). Those domains include (1) acquiring and using information; (2) attending and completing tasks; (3) interacting and relating with others; (4) moving about and manipulating objects; (5) caring for oneself; and (6) health and physical well-being.  20 C.F.R. § 416.926a(b)(1).

Functional equivalence is established with the finding of an "extreme" limitation, meaning "more than marked," in a single domain.  20 C.F.R. § 416.926a(a); *Ramos*, 2003 WL 21032012, at *8.  An "extreme limitation" is an impairment which "interferes very seriously with [the claimant's] ability to independently initiate, sustain, or complete activities."  20 C.F.R. § 416.926a(e)(3)(i) (emphasis added).

Alternatively, a finding of disability is warranted if a "marked"

limitation is found in any two of the listed domains. 20 C.F.R. §

416.926a(a); *Ramos*, 2003 WL 21032012, at *8.  A "marked limitation"

exists when the impairment "interferes seriously with [the claimant's] ability

to independently initiate, sustain, or complete activities."  20 C.F.R. §

416.926a(e)(2)(i).  "A marked limitation may arise when several activities or

functions are impaired, or even when only one is impaired, as long as the

degree of limitation is such as to interfere seriously with the ability to

function (based upon age-appropriate expectations) independently,

appropriately, effectively, and on a sustained basis."  20 C.F.R. Pt. 404,

Subpt. P, App. 1, § 112.00(C).

C.   Analysis

Plaintiff argues generally that the ALJ erred in failing to find that

claimant meets or functionally equals a listing, in that he failed to properly

weigh the opinion from treating pediatrician Dr. Fadi Alass, which she

argues shows, along with other evidence, that claimant is disabled.

On March 31, 2020, Dr. Alass opined that claimant has a number of

limitations related to the various domains of childhood functioning outlined

in the regulations.  In the domain of acquiring and using information, Dr.

Alass opined that plaintiff has an extreme loss[2] in his ability to work or study in coordination with others; marked losses[3] in his abilities perform within a schedule and maintain regular attendance, complete a normal school day or school week, demonstrate learning in academic assignments, plan ahead for future activities and begin realistic occupational planning; moderate losses[4] in his abilities to maintain attention and concentration, apply learning to daily situations without assistance, and comprehend and express both simple and complex ideas and use increasingly complex language in learning and daily living situations; and no or mild loss in his abilities to remember, understand, and carry out short and simple instructions. Administrative Transcript ("AT") at 503-04.[5]

In the domain of attending and completing tasks, Dr. Alass concluded that claimant has an extreme loss in his ability to plan and complete long-

---

[2]    An extreme loss is defined by the form as a "functional limitation [that] interferes very seriously with a child's ability to independently initiate, sustain, or complete" the activity.

[3]    A marked loss is defined by the form as a "functional limitation [that] interferes seriously with the child's ability to independently initiate, sustain, or complete" the activity.

[4]    A moderate loss is defined by the form as a "functional limitation [that] causes some loss of ability to initiate, sustain, or complete activities."

[5]    The administrative transcript is found at Dkt. No. 14, and will be referred to throughout this decision as "AT ___."

range academic projects independently; marked losses in his abilities to change activities or routines without distracting himself or others, focus to remember and organize materials, pay attention to increasingly longer presentations and discussions and maintain attention on tasks for extended periods of time without being unduly distracted or distracting to others; and moderate losses in his abilities to concentrate on details, sustain attention well enough to complete chores and read alone, complete a transition task without extra reminders, and maintain concentration while reading textbooks.  AT 504.

In the domain of caring for self, Dr. Alass opined that claimant has an extreme loss in his ability to think about future plans; marked losses in his abilities to be independent in most daily activities and maintain adequate personal hygiene; moderate losses in his abilities to understand right and wrong or acceptable and unacceptable behavior, demonstrate consistent control over behavior and avoid unsafe behaviors, imitate the behavior of known adults and notice significant changes in his body's development; and no or mild losses in his ability to identify when he feels good or bad. AT 505-06.

In the remaining domains of interacting and relating with others and moving about and manipulative objects, Dr. Alass found claimant has either

14

moderate or no/mild limitations.  AT 504-05.

After discussing Dr. Alass' opinion in detail, the ALJ concluded that it is not persuasive because, as to the factor of supportability, Dr. Alass' examinations have been primarily focused on claimant's physical issues, notations that claimant experienced symptoms such as anger, difficulty with focus, distractibility and organization were all reported by claimant's mother, and the notations of interactive behavior and normal eye contact and affect in Dr. Alass' records are inconsistent with the limitations he opined.  AT 25.  As to the factor of consistency, the ALJ found the opinion inconsistent with claimant's own denial of depressed mood and suicidal or homicidal ideation and characterization of his anxiety as stable, notations that his attention and concentration were good, and reports by teachers reflecting that he was polite and friendly, well liked, and had no more than slight problems in many domains of functioning.  *Id.*  The ALJ further specifically found that the opined extreme limitations in thinking about future plans and planning ahead are not consistent with evidence showing that claimant expressed plans to become a welder and formulated a plan to achieve that as part of his most recent IEP.  *Id.*

Plaintiff argues that the ALJ misconstrued the record in characterizing Dr. Alass' treatment of plaintiff as being primarily for physical impairments

and when concluding that the opinion is inconsistent with various records. Dkt. No. 19, at 15.  Plaintiff also argues that the ALJ is incorrect in stating that it was plaintiff, rather than claimant, who reported various mental symptoms to Dr. Alass, and that the ALJ ignored evidence of observed abnormalities on examinations while relying on some instances of normal presentation on other examinations.  *Id.*  Plaintiff further argues that the ALJ erred when comparing Dr. Alass' opinion with that of claimant's teacher, as she was no longer claimant's teacher and "she appears to have based her opinion on her expectation of the claimant's functional capacity in a scenario where he was able to attend school on a regular basis."  *Id.* at 17.  She lastly argues that the ALJ erred by ignoring the fact that Dr. Alass' opinion is consistent with both the opinion from LMSW Horne and claimant's school records.  *Id.*

Because the application in this case was filed after March 17, 2017, this case is subject to the amended regulations regarding evaluation of opinion evidence. Under those regulations, the Commissioner "will not defer or give any specific evidentiary weight, including controlling weight, to any medical opinion(s), . . . including those from your medical sources," but rather will consider whether those opinions are persuasive by primarily considering whether the opinions are supported by and consistent with the

record in the case.  20 C.F.R. § 416.920c(a); *see* 82 Fed. Reg. 5844-01, 2017 WL 168819, at *5853 (stating that, in enacting the new regulations, the agency was explicitly "not retaining the treating source rule").  An ALJ must articulate in his or her determination as to how persuasive he or she finds all of the medical opinions and explain how he or she considered the supportability[6] and consistency[7] of those opinions.  20 C.F.R. § 416.920c(b).  The ALJ also may – but is not required to – explain how he or she considered the other relevant enumerated factors related to the source's relationship with the claimant, including the length of any treatment relationship, the frequency of examinations by the source and the purpose and extent of the treatment relationship, whether the source had an examining relationship with the claimant, whether the source specializes in an area of care, and any other factors that are relevant to the persuasiveness of that source's opinion.  20 C.F.R. § 416.920c(c).

---

[6]      On the matter of supportability, the regulations state that "[t]he more relevant the objective medical evidence and supporting explanations presented by a medical source are to support his or her medical opinion(s) or prior administrative medical finding(s), the more persuasive the medical opinion or prior administrative medical findings(s) will be." 20 C.F.R. § 416.920c(c)(1).

[7]      On the matter of consistency, the regulations state that "[t]he more consistent a medical opinion(s) or prior administrative medical finding(s) is with the evidence from other medical sources and nonmedical sources in the claim, the more persuasive the medical opinion(s) or prior administrative medical finding(s) will be."  20 C.F.R. § 416.920c(c)(2).

Here, plaintiff has not argued that the ALJ failed to assess the factors of supportability and consistency, but rather contends that his findings regarding those factors are erroneous and not supported by substantial evidence.

As to the supportability factor, although plaintiff takes issue with the specific reasons provided by the ALJ, I find no error that would require remand. While the ALJ noted that Dr. Alass' examinations focused primarily on plaintiff's physical impairments, he also acknowledged that Dr. Alass' treatment notes did contain reports by claimant's mother that he was experiencing some mental health related symptoms. AT 25. The ALJ therefore did not find either that Dr. Alass did not provide any treatment related to plaintiff's mental impairments, nor did he conclude that Dr. Alass was unaware of those impairments, instead determining merely that most of the examinations he conducted related to physical observations. Because that is a reasonable interpretation of Dr. Alass' treatment records, I find no error in the ALJ's citation of this fact in support of his finding regarding Dr. Alass' opinion.

Plaintiff next appears to argue that the ALJ improperly assessed the mental symptoms reported to Dr. Alass by attributing them to claimant's mother despite the fact that the claimant himself provided some of those

reports, apparently arguing that it was the fact that the reports were from the mother that the ALJ took issue with. However, plaintiff's interpretation is not the only permissible reading of the ALJ's finding. Rather, I interpret the ALJ's statement regarding the mental symptoms present in Dr. Alass' notes as being a statement that the reports, whether they were made by claimant or his mother, were not corroborated by any objective findings by Dr. Alass in his examinations. This interpretation is supported by the ALJ's citation in the following sentence of his discussion of Dr. Alass' opinion to the generally normal mental status findings in Dr. Alass' treatment notes on the few occasions that Dr. Alass did conduct mental status examinations. Accordingly, whether the ALJ incorrectly attributed subjective statements to plaintiff as opposed to claimant has little bearing on the ultimate finding, which is that Dr. Alass observed nothing to corroborate the reports of anger and difficulty with focus, distractibility and organization.

Additionally, it is notable that plaintiff has not offered any citation to portions of Dr. Alass' treatment records that would support the level of restriction included in his opinion. On March 15, 2018, it was documented that anxiety and depression screens showed that symptoms were present, but the actual care provided at that appointment was related to upper respiratory and sinus symptoms, and no assessment was made of

claimant's mental functioning.  AT 290-91.  In May of 2018, claimant presented for a well-child examination and, despite mental health screening again indicating the presence of some symptoms of anxiety and depression, there were no specific reports of problematic mental health symptoms and a mental status examination revealed that he was interactive with normal eye contact and normal affect for his age.  AT 282.

In November of 2019, after an apparent large gap in treatment with Dr. Alass, claimant and his mother expressed concerns about "occasional anger issues," difficulty focusing, being distracted, and with organization and remembering school work.  AT 443.  At that time, claimant denied experiencing a depressed mood, although he reported sadness and anxiety related to his deteriorating school performance.  *Id.*  A mental status exam revealed he was interactive with normal eye contact and normal affect for his age.  AT 445.

In January of 2020, claimant reported to follow up regarding abdominal pain and elevated liver enzymes, and did not report or receive assessment of any mental health issues at that time.  AT 431-32.  Approximately a week later, he presented again primarily for physical complaints, and reported that his anxiety was stable although he noted that he has difficulty sleeping because his brain is "so busy with so many

random things."  AT 424.  No mental status examination was performed at that appointment, and claimant was directed to start hydroxyzine at bedtime to address his sleeping issues.  AT 425-26.  Despite this recommendation, in March of 2020, it was reported that claimant had declined to start hydroxyzine for his nighttime anxiety, although he continued to report issues with sleeping that caused him to be tired, easily agitated, moody, and angry during the day.  AT 416.  He reported that he does not go to sleep until five or six in the morning sometimes because he stays up late playing video games.  *Id.*  Dr. Alass also noted that claimant had declined medication and was not willing to start counseling.  *Id.*  No mental status examination was recorded.  AT 418.  Dr. Alass wrote that he "had a long discussion" regarding sleep hygiene and "potential mental and academic consequences of his disrupted sleep pattern," noting that "anxiety is only one factor in his sleep problem," and continued to advise him to start counseling and hydroxyzine.  AT 418-19.

These treatment notes show no objective findings to corroborate the symptoms reported by claimant and his mother, contain no notations of abnormalities on mental status examinations, and indicate that claimant has refused to take prescribed medication or attend counseling intended to address his difficulties sleeping.  The treatment notes also indicate that Dr.

Alass believed that anxiety was only one part of what was causing claimant's sleep issues, with poor choices related to sleep hygiene also contributing to his lack of sleep. Accordingly, while Dr. Alass' treatment records do document that claimant reported difficulty sleeping, and that lack of sleep directly contributed to his alleged mood and concentration issues, they also indicate that claimant was not following any prescribed treatment or behavior modifications to address that issue.[8] After a careful consideration of Dr. Alass' treatment notes, I find that the ALJ's assessment of supportability is not erroneous and is supported by substantial evidence.

Plaintiff also argues that the reasons provided by the ALJ regarding the consistency of Dr. Alass' opinion are not supported by substantial evidence. I find this argument to be similarly unavailing. I note as an initial matter that there is very little treatment of the claimant documented in the record, other than that which was provided by Dr. Alass. There are a few treatment notes from Family Nurse Practitioner ("FNP") Maria Okwor from March of 2018, in which it is reported that he had issues with depression

---

[8]    I note also that Dr. Alass' indication in the March 2020 treatment note that claimant was not taking hydroxyzine as prescribed appears to be inconsistent with his opinion from the same month that plaintiff takes hydroxyzine on a regular basis. AT 506. Regrettably, there is no treatment note from Dr. Alass after March 10, 2020 from which to assess whether claimant began to take hydroxyzine later in March.

and anxiety that contribute to nausea and diarrhea, that his mother had to hide a knife because claimant had an obsession with it, that claimant urinates in his room at night because he is afraid of the dark, that he chews on his clothes due to anxiety, and that he had difficulty passing classes the previous year and had to attend summer school.  AT 303, 313. Examinations on these two occasions were both normal, and FNP Okwor wrote that medical providers would reevaluate whether claimant should be on medications for his depression and anxiety after some further evaluation.  AT 304-05, 315.  Additionally, there are handwritten records from LMHC Cindy Horn for four instances of treatment.  AT 545-48.  Those notes, however, are largely illegible, other than indications that claimant presented as anxious, and do not undermine the ALJ's finding that Dr. Alass' opinion is inconsistent with the evidence in the record.

The only examination that revealed any significant mental symptoms was that conducted by consultative examiner Dr. Jeanne Shapiro in September of 2018.  In that examination, she observed that claimant had lethargic motor behavior, poor eye contact, a sad and withdrawn appearance, a constricted and somewhat reduced affect, a below average fund of information, poor insight and judgment, and borderline-to-deficient cognitive functioning based on a consideration of his broad spectrum of

functional abilities.  AT 385-86, 391.  He was observed, however, to have

adequate language and intact attention and concentration, and he was

found to be cooperative.  AT 385, 391.  Dr. Shapiro overall concluded that

claimant experiences no more than moderate limitations in most areas of

functioning, with a moderate-to-marked limitation in maintaining appropriate

social behavior.  AT 386-87.[9]

Further, although claimant's school records document difficulties, the

ALJ is correct that they are inconsistent with the level of limitation Dr. Alass

opined.  Summaries of performance and achievement from his 2018 IEP

indicate that he has a Full Scale IQ of 81 "with skills ranging from average

to very low average," that his daily living skills appear to be within normal

limits based on observations made at school, he seemed to work hard on a

writing task although he had some issues with word identification and

answering questions correctly, he was noted to be a good writer with an

ability to adjust to the tone of the material, and he expressed interest in

working in the computer technology field after graduation, although it was

noted he acknowledged he would need to improve his math skills to do

that.  AT 179.  It was further observed that "[h]e is willing to work but often

---

[9]      I note that the ALJ found Dr. Shapiro's opinion regarding social limitations to be
unpersuasive, a finding which plaintiff has not challenged and which I find to be
supported by substantial evidence.

forgets to follow through with started assignments," and does not like to be singled out in class. *Id.* Claimant was also noted to be friendly and polite, although he was rated as having difficulty with attention and learning among other things. AT 180. It was also noted that claimant needed to be more consistent with his school attendance. AT 180-81. A psychoeducational report from March of 2018 indicated that claimant had poor grades, but that he also had a very high level of absenteeism from school, although he was observed to be uninterested and failing to do work during a math class lesson and was noted to be internally distracted and somewhat off-task during cognitive testing. AT 188-94.

In his 2019/2020 IEP, it was noted that claimant had low grades in reading, math, and writing because he did not complete all of the course work he was required to make up due to his excessive absences, and it was specifically stated that he "would be doing much better in his class if his number of absences decreased and he was well-rested for the school day." AT 517-18. It was reiterated as part of a section regarding needs of the student that "claimant needs to attend school every day and he also needs to sleep more so he can put forth his best effort." AT 518. The educational records therefore corroborate that, although claimant experienced difficulties in school, large contributors to those difficulties

were his chronic absenteeism and his lack of sleep.  As to absenteeism, there is no evidence in the record to indicate that claimant was absent due to his physical or mental impairments.  Claimant himself testified at the hearing that some of his absences were due to feeling sick, but in general he simply did not want to go to school.  The medical record does not corroborate chronic stomach issues or diarrhea at an ongoing level that would explain such frequent absences for multiple years, nor is there any indication that claimant took medication to manage his anxiety to the extent that impairment contributed to either his diarrhea or his unwillingness to go to school.  Similarly, as to claimant's lack of sleep, as was already discussed, claimant seemingly failed to take prescribed hydroxyzine, attend counseling, or follow sleep hygiene recommendations that Dr. Alass provided to address his reported sleep difficulties.  Because the educational records indicate that absenteeism and lack of sleep, rather than inherent difficulties concentrating caused by claimant's ADHD or other impairments, were the likely cause of much of his poor performance at school, those records further support the ALJ's finding that Dr. Alass' opinion is not consistent with the record as a whole.

Plaintiff argues that the ALJ should not have relied on the opinion from special education teacher Lisa Eckstrom when assessing the

consistency of Dr. Alass' opinion because she was no longer claimant's

teacher at the relevant time and "she appears to have based her opinion on

her expectation of the claimant's functional capacity in a scenario where he

was able to attend school on a regular basis."  Dkt. No. 19, at 17.  This

argument is flawed for several reasons.  First, although plaintiff is correct

that Ms. Eckstrom was not claimant's teacher during the relevant period,

she indicated that she had known him for two years as of the date of her

opinion in September 2018, and that she had seen him daily during school

days when she was his resource room teacher.  AT 232.  I also note that,

at the administrative hearing regarding plaintiff's application, plaintiff

testified that although Ms. Eckstrom was no longer claimant's teacher, she

still helped him even into 2020, and affirmed that Ms. Eckstrom is "pretty

familiar with him."  AT 66.  The fact that she was no longer claimant's

official teacher therefore does not invalidate her opinion.

Secondly, I do not agree with plaintiff's unexplained conclusion that

Ms. Eckstrom's opinion was intended to be a picture of how claimant would

function if he attended school regularly.  Notably, in the explanation section

regarding the domain attending and completing task, in which she opined

that claimant experiences a few obvious or slight problems in some areas

of functioning, Ms. Eckstrom specifically stated that those limitations were

27

"[b]ecause he wasn't here," which indicates that she actually found him to be *more* limited than she might have had he attended school regularly.  AT 234.  Indeed, Ms. Eckstrom's comments throughout the opinion give the impression that she found limitations existed primarily because claimant missed so much school.  AT 239.  Further, the level of limitations outlined in the opinion are clearly at odds with the level of limitation opined by Dr. Alass.  I therefore find no merit in plaintiff's arguments that the ALJ erred in pointing to the opinion of Ms. Eckstrom as being inconsistent with Dr. Alass' opinion.  Moreover, I note that, in addition to Ms. Eckstrom's opinion, the ALJ also relied on the multiple other opinions in the record showing lesser limitations, the assessments of which plaintiff has not challenged. Those opinions, and the ALJ's assessment of them, also support the ALJ's consistency finding as to Dr. Alass' opinion.

I further find no error in the ALJ's citation to the fact that the opined extreme and marked limitations related to independent future planning were inconsistent with the most recent IEP, which indicated claimant has plans to pursue a career as a welder.  I note that the IEP indicates that claimant himself "has expressed that his goal is to work as a welder," that he stated his strengths in working on machines and doing physical activities, that he feels he is a hands-on learner, and that he has

28

acknowledged that he "needs to work on improving his organizational skills, his task completion skills, and his math skills" in order to succeed in that career.  AT 517-18.  Thus, even if claimant might receive some guidance from school staff regarding the logistics of career planning, the IEP makes clear, as the ALJ recognized, that claimant was not as limited in his ability to plan for the future as Dr. Alass otherwise opined.  I therefore find no error in the ALJ's citation to this fact as part of his overall analysis of the consistency factor.

As to plaintiff's argument that the ALJ erred in failing to consider the fact that Dr. Alass' opinion is consistent with the opinion provided by LMSW Horn, that argument ignores the fact that the ALJ found that opinion to be unpersuasive for itself being unsupported and inconsistent with the evidence in the record as a whole.  AT 26.  The ALJ specifically highlighted the fact that LMSW Horn had seen claimant only four times, the last being in May 2018, which was two years prior to when she provided her opinion, and right on the cusp of when claimant alleges that his disability began. Because plaintiff has not presented arguments as to how the ALJ's assessment of LMSW Horn was erroneous, and because I see no error in that assessment after my review of the record, whether that opinion is consistent with Dr. Alass' opinion is immaterial.

For all of the above reasons, I recommend a finding that the ALJ's assessment of Dr. Alass' opinion, and his overall conclusions regarding whether claimant meets or equals a listing, either medically or "functionally," are supported by substantial evidence.

IV.    <u>SUMMARY AND RECOMMENDATION</u>

After considering the record as a whole and the issues raised by the plaintiff in support of his challenge of the Commissioner's determination, I recommend a finding that the determination resulted from the application of proper legal principles and is supported by substantial evidence. Accordingly, it is hereby respectfully

RECOMMENDED that the Commissioner's decision be AFFIRMED, defendant's motion for judgment on the pleadings (Dkt. No. 22) be GRANTED, plaintiff's motion for judgment on the pleadings (Dkt. No. 19) be DENIED, and plaintiff's complaint be DISMISSED.

Pursuant to 28 U.S.C. § 636(b)(1), the parties have fourteen days within which to file written objections to the foregoing report.  Such objections shall be filed with the Clerk of the Court.  <u>FAILURE TO OBJECT TO THIS REPORT WITHIN FOURTEEN DAYS WILL PRECLUDE APPELLATE REVIEW</u>. *Roldan v. Racette*, 984 F.2d 85 (2d Cir. 1993) (citing *Small v. Sec'y of Health and Human Servs.*, 892 F.2d 15 (2d Cir.

1989)); 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72.

Dated:      October 14, 2022          _____
            Syracuse, NY              DAVID E. PEEBLES
                                      U.S. Magistrate Judge